Obici Trust.

Argued April 18, 1957. Before JONES, C. J., CHID-SEY, MUSMANNO, ARNOLD and COHEN, JJ.

*Bernard G. Segal,* with him *Edward W. Mullinix, James W. Scanlon, William A. Schnader* and *Schnader, Harrison, Segal & Lewis,* for appellant.

*Andrew Hourigan, Jr.,* with him *John R. Lenahan, White, Rowlands & Hourigan* and *Morgan, Lewis & Bockius,* for appellees.

*M. Paul Smith,* with him *J. Brooke Aker,* and *Smith, Cahall & Aker,* for interested party, under Rule 46.

OPINION BY MR. JUSTICE CHIDSEY, September 30, 1957:

This declaratory judgment proceeding concerns the interpretation of two paragraphs of an instrument creating a charitable trust executed by Amedeo Obici,

founder of the Planters Nut and Chocolate Company, on January 13, 1945 with two amendments made thereto that same year and a third amendment made in 1946. By a stipulation of counsel dated June 11, 1956 the conclusions of the court as to the Charitable Trust[1] thus created were also to apply to similarly worded paragraphs of instruments executed by the settlor on the same day creating the so-called Friends and Relatives Trust and the so-called Angeline Obici Sangiuliano Trust,[2]

After setting forth the duties and powers of the "Corporate Trustee" (The Third National Bank and Trust Company of Scranton, Pa.), the "Individual Trustee or Trustees", and the "Trustees" (meaning both the corporate and individual trustees), the last two paragraphs preceding the attestation clause of the instrument appear, as amended:[3]

"18. Upon the death of the Settlor, Mario Peruzzi shall act as co-trustee with the Corporate Trustee, and upon the death of Mario Peruzzi, Frank A. English, R. S. Lisman, C. H. Murden and Joseph Rocereto shall act as co-trustees with the Corporate Trustee.

"If any of the individual co-trustees herein shall die, resign, refuse to act, be declared mentally incompetent or remove themselves or be removed for any cause, then the surviving individual co-trustees shall

---

[1] The major beneficiary of the Charitable Trust is the Louise Obici Memorial Hospital of Suffolk, Virginia, named for settlor's wife. Under settlor's will, a principal beneficiary was this Charitable Trust, which now contains 90,475 shares of the Planters Nut and Chocolate Company.

[2] The three trusts together now hold a total of 103,950 shares of Planters Nut and Chocolate Company, out of a total of 208,783 shares outstanding.

[3] The amendment merely removed a fifth name from the listing of individual trustees to succeed Mario Peruzzi, and changed the word "five" to "four" where appropriate.

appoint another individual or individuals to act as successor co-trustee so that at no time shall there be less than four individuals acting as co-trustees. The successor individual co-trustee so appointed shall not be related to any of the other co-trustees then acting.

"The individual Trustees shall not be required at any time to file a bond in order to qualify or to act."

"19. In the event of a disagreement between the Corporate Trustee and the Individual Trustee or Trustees, the decision of the Individual Trustee or Trustees shall be conclusive and binding. In the event of a disagreement among the individual Trustees, the decision of Joseph Rocereto shall be conclusive and binding. In the event Joseph Rocereto is not a co-trustee at the time, the decision of a majority of the Individual Trustees shall be conclusive and binding."

Upon the death of the settlor on May 21, 1947, Mario Peruzzi, settlor's brother-in-law, became the individual trustee as designated by paragraph 18. When Peruzzi died on December 10, 1955, C. H. Murden, one of the four named to succeed him, had predeceased Peruzzi, and this gives rise to the immediate controversy.

Frank A. English and R. J. Lisman, appellees here, had been, along with C. H. Murden, long time managerial employes of the Planters Nut and Chocolate Company. They appointed P. J. McGough, another employe of Planters, to fill the vacancy created by Murden's death. It is their contention that they were empowered to do so by paragraph 18 of the trust instrument, as a majority of the "surviving individual co-trustees", and under the prevailing rule in the law of charitable trusts that the decision of a majority of the trustees is binding, Restatement of Trusts, §383. They are joined in this contention by the Louise Obici Memorial Hospital, as an interested party under our Rule

46, which advances the theory that the settlor intended control of the trust to remain with what in effect would be a management group of the Planters Nut and Chocolate Company, rather than intending ultimate control to reside in appellant alone.

The appellant, Joseph Rocereto, related to settlor by marriage, appointed Elizabeth Obici Peruzzi, sister of the settlor and widow of Mario Peruzzi, to fill the vacancy created by C. H. Murden's death, in conflict with appellees' selection of McGough. He contends that he was empowered to do so because there was a "disagreement" among the individual trustees, and in such a case the section of paragraph 19 which states: ". . . In the event of a disagreement among the individual Trustees, the decision of Joseph Rocereto shall be conclusive and binding. . . .", governs. His contention is that settlor intended that first an individual (Peruzzi) in whom he had complete confidence should control the trust, and, then, that appellant, a personal, not a "business" associate of settlor, should have a curb over the "management team".

The Corporate Trustee, The Third National Bank of Scranton, receiving "appointments" to fill the vacant trusteeship from both appellant and appellees, notified appellees by letter dated March 15, 1956, that it deemed Elizabeth Obici Peruzzi, appellant's appointee, to be the trustee to succeed C. H. Murden.

Whereupon appellees filed this petition for declaratory judgment in the Orphans' Court of Lackawanna County, praying that the court ". . . enter a Declaratory Judgment and Decree construing and interpreting Paragraphs 18 and 19 of the Charitable Trust . . ."; ". . . enter such a decree construing the terms of the Charitable Trust as will establish, for the future administration of the Trust, that Joseph Rocereto does not have arbitrary, capricious and sole power over the

Trust in derogation of the common law doctrine of majority rule among the Trustees of Charitable Trusts and in violation of your petitioners' obligations as Trustees to administer the Trust in such way as each of them individually shall determine for the best interest of the beneficiaries."; and that the court void the appointment of Elizabeth Obici Peruzzi, and confirm the appointment of P. J. McGough to fill the vacancy created by the death of C. H. Murden.

Appellant filed an answer, as did the bank as corporate trustee. The case was heard on petition, answers, and stipulation of counsel by the orphans' court which on August 24, 1956, entered the following decree:

"1. The power of appointment to fill vacancies in the four successor co-trusteeships under the provisions of paragraph 18 of the trust agreement, as amended, cannot be vitiated by the exercise by Joseph Rocereto, successor co-trustee, of the power of decision conferred on him in paragraph 19 of the agreement.

2. The power of conclusive and binding decision conferred on Joseph Rocereto in paragraph 19 of the trust agreement can only be exercised in the event of a disagreement among four acting co-trustees.

3. The power of conclusive and binding decision conferred on Joseph Rocereto under paragraph 19 cannot be exercised to fill a vacancy in one of the four successor co-trusteeships established in paragraph 18 of the agreement.

4. The appointment of P. J. McGough as successor co-trustee in place and stead of C. H. Murden, deceased, was a proper and valid appointment under the provisions of paragraph 18 of the trust agreement.

5. The appointment of Elizabeth O. Peruzzi to the vacancy by the exercise by Joseph Rocereto of his pow-

er of decision under paragraph 19 of the trust agreement was invalid.

6. The Clerk of this Court is directed to note on the instrument of appointment and acceptance of Elizabeth O. Peruzzi, filed February 23, 1956, that it is of no effect and to enter an appropriate note on the docket entry." From this decree, appellant prosecutes this appeal.

Appellees contend that "Paragraph 19 of the deed relates only to disagreement between the Corporate Trustee and the Individual Trustees". With this contention we cannot agree. It is clear that settlor contemplated that the various trustees, being human, might on occasion disagree. It cannot be controverted that, as between the corporate and the individual trustees, settlor intended that the individual trustees should govern. He assured this in paragraph 14 by stipulating that "The Settlor, during his lifetime, and thereafter the Individual Trustee or Trustees then acting, shall have the right to require the Corporate Trustee to resign, and to substitute in place of said Corporate Trustee a new Corporate Trustee, . . . The Settlor, during his lifetime, and thereafter the Individual Trustee or Trustees then acting, shall have the right in like manner to require any succeeding Corporate Trustee to resign and to appoint a new successor Corporate Trustee in its place. . . .". Thus he assured control of the Trust to the Individual Trustee or Trustees, and nothing more would seem to be necessary to effectuate this intention.

Yet, in paragraph 19, the last paragraph of the instrument, there appears a sentence referring to disagreements between the Corporate and Individual Trustees, providing that the "decision of the Individual Trustee or Trustees shall be conclusive and binding."

The major question here is whether that sentence shall be read as an independent general direction regarding disagreements between the Corporate and Individual Trustees of a degree not necessitating replacement of the Corporate Trustee under paragraph 14, or should it be read, as appellees contend, as the opening sentence of an integrated paragraph limiting the application of the two succeeding sentences?

Considering the instrument itself, it is to be noted that few if any of the numbered paragraphs are so completely self-contained as to stand alone without reference to other paragraphs. And each sentence within a numbered paragraph is not so totally involved in the previous sentence that it cannot in certain instances be removed from the numbered paragraph, made to stand alone as a separate or numbered paragraph, and still allow the instrument as a whole to be construed without inconsistency. The instrument is topically arranged, each numbered paragraph containing provisions relating to the same general matter, and the numbered paragraphs dealing with the same general class of matters are grouped together.

Thus, the first paragraph directs that the Corporate Trustee shall have physical possession of the trust res. The second, third and fourth paragraphs enumerate the rights, powers and liabilities of the Trustees in the management of the trust res. The fifth and sixth paragraphs relate to the management of two specific portions of the trust res. The seventh, eighth and ninth paragraphs pertain to the trust income. The tenth paragraph directs that voting rights of stock in the trust res shall be solely in the Individual Trustees. The eleventh, twelfth, thirteenth and fourteenth paragraphs relate largely to the appointment, resignation, compensation and removal of the Corporate Trustee. The fifteenth paragraph is a general one pertaining to

later additions to the trust res, the sixteenth generally prohibits encumbrances by the beneficiaries, and the seventeenth is a general direction as to payment of taxes. The eighteenth paragraph, set out above, contains several provisions pertaining to the original and subsequent appointment of the Individual Trustees, their number, their relationship, and a direction that no bond be required of them.

Thereupon follows the nineteenth paragraph, which we construe to be a *general* one relating to the general question of disagreements. We are driven to this conclusion not only because of the placement of the paragraph, but because of its wording. If the paragraph were to refer only to disagreements stemming from a disagreement between the Corporate and Individual Trustees, it would logically follow or precede paragraph 14, which relates to the power of the Individual Trustee or Trustees "to require" resignation of the Corporate Trustee, or fall among paragraphs 11, 12, 13 and 14 which deal generally with the Corporate Trustee. In this case it is found at the end of the instrument, the place customarily reserved for general clauses, following the general provisions of paragraphs 15, 16 and 17, and after paragraph 18 relating to Individual Trustees.

Turning to the language of the second sentence of paragraph 19, it is not such as would refer back, or appear to be limited by, the first sentence of the paragraph. The first sentence begins "In the event of a disagreement between . . .". This does not refer to a specific disagreement or class of disagreements, but refers to disagreements generally between the Corporate and the Individual Trustees, and apparently to disagreements not otherwise resolved by the instrument. Similarly the second sentence begins "In the event of *a* disagreement . . .". This again appears to

be a general direction. If it were meant only to refer back to the first sentence, the language would be "In the event such a disagreement extends to the Individual Trustees . . .", or something to that effect. Limiting words or phrases were not strange to the draftsman of this instrument. In paragraph 5, relating to Planters Nut and Chocolate Company stock, the concluding sentence reads: "The Trustees shall not be liable for any loss which may occur by reason of their holding *such* stock", thus limiting the applicability of the sentence to the stock described in paragraph 5, and not to that referred to in paragraph 4 or elsewhere.

To read paragraph 19 as appellees contend would almost make it meaningless. Certainly the power "to require" the resignation of the Corporate Trustee, virtually assures that "disagreements" would be minimal at most. The Corporate Trustee here is almost in the position of being an employe, trusted and valuable it is true, but serving only at the will of the Individual Trustees. They may fire the Corporate Trustee and hire another, almost without limitation.

It seems clear that paragraph 19 was intended to generally cover "disagreements", where not otherwise resolved, and that the second and third sentences of paragraph 19 apply generally to disagreements among the Individual Trustees, not only to the disagreements envisioned in the first sentence of that paragraph.

It does not follow, however, that paragraph 19 applies to situations otherwise treated in the trust instrument. Certainly a "disagreement" as to where trust property should be kept could not be "resolved" by an appeal to paragraph 19 by the appellant, in light of the direction in paragraph 1, that "The Corporate Trustee shall have physical possession of all property constituting this trust." The first or second sentence

of paragraph 19 would apply only where the trust instrument is not otherwise explicit. This is merely a restatement of the well known rule of construction that the specific provisions of an instrument will govern where applicable, when in conflict with general provisions.

Paragraph 18 deals with the appointment of the Individual Trustees. It discloses a scheme of operation, which, when taken with the last two sentences of paragraph 19, disclose how the settlor intended this trust to be managed. We have already seen that the Individual Trustee or Trustees were to control over the Corporate Trustee. After settlor's death he entrusted the management of the trust to Peruzzi, related to him through marriage, a business associate, and apparently his friend and one whom he trusted. After Peruzzi's death, management was to pass to a group, three of whom were business associates, and a fourth, who was not a business associate, but related by marriage and apparently a friend, the appellant Rocereto. While a majority of the trustees were to be of the so-called "management group", the settlor clearly gave Rocereto a power to curb that group, so long as Rocereto should live. After Rocereto's death, control would rest squarely with the "management group", since the "decision of a majority" would thereafter be binding in "disagreements". Thus while settlor intended to curb the management group during the lives of Peruzzi and Rocereto, it is clear that in time he intended control to pass to the "management group". He confirmed this intention by specifically restricting potential nepotistic practices, (contrary to his own practice), a further indication that he intended control to eventually shift from himself, to his relatives, and then to an unrelated "management group".

Settlor's direction was that, upon the death of one of the individual co-trustees, ". . . the surviving individual co-trustees shall appoint another individual or individuals to act as successor co-trustee so that at no time shall there be less than four individuals acting as co-trustees." No limitation was placed upon this power to "appoint". No one co-trustee was given a conclusive or binding decisional power in this regard. To permit appellant to exercise the power conferred upon him in general matters by paragraph 19 to this situation presented by paragraph 18, would be to permit him, depending on the chance of death, potentially to displace the "management group" as the eventual group in control of this trust, and, in effect, in control of Planters Nut and Chocolate Company, with trustees of appellant's choosing. This we believe the settlor did not intend. Quite the contrary, he intended the management group to replace itself, thus insuring eventual control of the trust in hands sympathetic to the management of Planters.

In so far as the Charitable Trust is concerned, the decree of the orphans' court was correct.

A further question, however, is raised by the parties, which was not dealt with directly by the orphans' court in its adjudication, and that concerns the effect of its decree on the so-called Friends and Relatives Trust and on the Angeline Obici Sangiuliano Trust.

The stipulation of counsel, dated June 11, 1956, after making the Friends and Relatives Trust instrument and the Angeline Obici Sangiuliano Trust instrument a part of the record in this case, and placing them before the court, goes on to state: "2. That the conclusions of the Orphans' Court of Lackawanna County in the above captioned matter shall apply to the Trusts set forth above in subsections (b) [the Friends and Relatives Trust] and (c) [the Angeline Obici San-

giuliano Trust] of paragraph one and shall have the same effect upon the parties hereto as if each of the foregoing Trusts was the subject of a separate proceeding by declaratory judgment upon the same issues herein involved."

Appellant asserts that even if the orphans' court's conclusion that Rocereto's authority does not extend to the selection of a successor trustee in the charitable trust be correct (thus vesting selection of the successor trustee in a majority of the individual trustees), that conclusion could not be extended to the private trusts, because as to them a decision of the trustees must be unanimous,[4] Restatement, Trusts, §194; that counsel did not have the power to stipulate away the common law duty of the trustees of a private trust to act unanimously; and that so much of the decision of the orphans' court as related to selection of the successor trustee in the Charitable Trust was not extended by the stipulation to apply to the selection of the successor trustee in the private trusts ". . . because appellees' selection of McGough did not represent the unanimous decision of all trustees as required in the case of a private trust."

Appellees, on the other hand, contend that: "The intent of the Stipulation, which was to change the common law rule in this respect if necessary in order to put the administration of these two Trusts upon the same basis as the Charitable Trust, is clearly enough stated."

Both of these positions go too far. Appellant's position would leave the immediate problem which gave

---

[4] Section 949 of the Fiduciaries Act of 1949, P. L. 512, 20 PS §320.949, changes this rule as to testamentary trusts and irrevocable trusts coming into being after January 1, 1950, but is inapplicable here, see Section 105, 20 PS §320.105.

rise to this litigation (i.e., appointment of a successor individual trustee) unresolved as to the private trusts, thus making the stipulation almost meaningless. Appellees' position, on the other hand, would extend the effect of the stipulation far beyond the resolution of the immediate problem, in derogation of the common law rule.

The issues raised in the original declaratory judgment action related to (1) whether Joseph Rocereto had the sole power to control the selection of a successor trustee, and (2) the extent of the general power to control the decisions of the trustees given to Joseph Rocereto by the trust instruments. Neither of these issues embraced the question of whether a unanimous or a majority vote of trustees is required to reach a decision in situations where the common law rules had not been changed by the settlor. In cases where Rocereto would not choose to exercise his "control" power, or in situations where the trust instrument did not give him "control" power, the applicable rules of the common law or the statutes of this Commonwealth would apply. A stipulation extending the "conclusions of the Orphans' Court" as to the interpretation of the charitable trust instrument to the private trusts does not even bring the common law rules into play, much less "change the common law rule" that ". . . the powers conferred upon them can properly be exercised only by all the trustees, unless it is otherwise provided by the terms of the trust.", Restatement of Trusts, §194. In our view the effect of the stipulation, apart from making the court's interpretation of appellant's general powers in case of a disagreement among the individual trustees applicable to the private trusts, was to place the disagreement of the individual trustees on the question of selection of the successor trustee in the private trusts before the orphans' court for decision.

The very evident purpose of the stipulation was to prevent the necessity of a "separate proceeding" for the determination of the appointive rights in the private trusts, and to avoid the further litigation with respect thereto which was otherwise bound to ensue, or as it was stated in the brief of the Louise Obici Memorial Hospital, was inevitable and imminent. It was clear that the individual co-trustees were unable to act in concert in this regard, as required by the law pertaining to private trusts. It was equally clear that the trust instruments required the surviving individual co-trustees to appoint a fourth individual co-trustee. Under these circumstances it is perfectly proper to have the disagreement of the trustees resolved by the orphans' court.

In *Corn Exchange National Bank and Trust Company et al. v. Jones et al.,* 112 Pa. Superior Ct. 32 (1934), 170 A. 713, the creator of the trust had designated three executors and trustees, had provided that the number "shall be not less than three", and had directed that in case of the death, resignation, etc. of a trustee, the surviving trustees, with the consent of a majority of his living children, should fill the vacancy. Notwithstanding the directions, the vacancies were not filled over a period of years. It was held that payment on a mortgage which was part of the trust res, made to one other than a properly appointed trustee, could not discharge the debt. The Court stated, at p. 37: "We think, undoubtedly, the legislative policy in this Commonwealth is that where there are active duties to perform and there is a vacancy in the trusteeship, the courts are required, upon application and proper proof, to fill the vacancy. That the court is required to appoint a trustee or trustees is especially true if the clear intent appears in the will, as here, that a vacancy shall be filled. If another method of filling the va-

cancy is directed by the testator, it should be followed; if not, the court should act."

While the two private trust instruments in the instant case direct that appointment of a successor individual trustee should be made by the surviving individual co-trustees, when disagreement makes this impossible, a court may be called upon to effectuate settlor's intention that the vacancy be filled. In this regard, comment a. to Section 194 of the Restatement of Trusts, relating to non-charitable trusts, is pertinent: "Requirement of unanimity. If there are two or more trustees, action by all of them is necessary to the exercise of the powers conferred upon them as trustees. If one of them refuses to concur in the exercise of a power, the others cannot exercise the power. In such a case, however, if it appears to be for the best interest of the trust that there should be an exercise of the power, the court may on the application of a co-trustee or beneficiary direct its exercise. . . ."

In this Commonwealth, the proper court to resolve this problem is the orphans' court, which has power to appoint a successor trustee in a proper case, Fiduciaries Act of 1949, April 18, P. L. 512, §901, 20 PS §320.901; which in testamentary trusts and irrevocable trusts becoming effective on or after January 1, 1950,[5] has power to resolve disagreements among the trustees, Fiduciaries Act of 1949, §949, 20 PS §320.949; and the same court has exclusive jurisdiction over testamentary trusts and inter vivos trusts, Orphans' Court Act of 1951, August 10, P. L. 1163, §301, as amended, 20 PS §2080.301. Section 949 of the Fiduciaries Act of 1949, (although inapplicable here because the trust instru-

---

[5] These trust instruments were executed on January 13, 1945, and became irrevocable on settlor's death, May 21, 1947, prior to the effective date of §949 of the Fiduciaries Act of 1949.

ments predate the effective date of this section), is declarative of the policy of resolving disagreements among co-trustees by petition to the orphans' court, and Section 4 of the Uniform Declaratory Judgments Act, 1923, P. L. 840, 12 PS §834, permits a ". . . declaration of rights or legal relations . . .(b) To direct the . . . trustees to do or abstain from doing any particular act in their fiduciary capacity; or (c) To determine any question arising in the administration of the . . . trust . . .".

We are of the opinion that the adjudication of the orphans' court did not go far enough and that it should have embraced in the reach of its adjudication specific findings with respect to the proper successor to C. H. Murden as individual trustee in the Friends and Relatives Trust and in the Angeline Obici Sangiuliano Trust. We shall therefore return the record to the orphans' court with direction that it have such notice served upon the parties in interest as it shall direct, and receive such nominations from the interested parties as it deems proper (in accord with the principles set forth in *McCaskey's Estate*, 293 Pa. 497, 143 A. 209, and Section 901 of the Fiduciaries Act of 1949); and that it thereafter direct the appointment of a successor trustee or trustees to fill the vacancies caused by the death of C. H. Murden in the so-called Friends and Relatives and in the Angeline Obici Sangiuliano Trust.

For the reasons hereinbefore set forth the decree of the orphans' court is accordingly affirmed, with direction that the record be returned to it for further proceedings consonant with this opinion.

Decree affirmed with a procedendo; costs of this appeal to be paid by the trust estate.

Mr. Justice COHEN dissents.