2017 PA Super 350

| IN RE: JOHN E. JACKSON AND SUE M. JACKSON CHARITABLE TRUST | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: POLLY J. TOWNSEND AND WILLIAM R. JACKSON, JR. | |
| | No. 61 WDA 2017 |

Appeal from the Order Dated December 7, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): 3999 of 1988

BEFORE: BENDER, P.J.E., SOLANO, J., and MUSMANNO, J.

OPINION BY SOLANO, J.: **FILED NOVEMBER 07, 2017**

This case arises out of a dispute between the individual trustees (Appellants Polly J. Townsend and William R. Jackson, Jr.) and the corporate trustee (Appellee PNC Bank, N.A.) of the John E. Jackson and Sue M. Jackson Charitable Trust ("Trust"). Townsend and Jackson (hereinafter, "Individual Trustees") appeal from a December 7, 2016 Orphans' Court order entered under Section 7763(a.1) of the Uniform Trust Act ("UTA"),[1] that resolved that dispute by limiting the amount that could be distributed by the Trust to charities in 2016 and by designating which charities could receive distributions from the Trust that year. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

---

[1] 20 Pa. C.S. § 7763(a.1).

The settlors, John E. Jackson and Sue M. Jackson (referenced in the Trust Agreement — and hence in this opinion — as "Grantors") established the Trust on February 6, 1950. John Jackson lived until April of 1971, and Sue Jackson lived until January of 1994. The Trust Agreement named two trustees, W.R. Jackson (John E. Jackson's brother) and Commonwealth Trust Company of Pittsburgh.

The Trust Agreement provided, in part:

4. This trust is created solely for charitable purposes, and the income and principal of the trust estate is to be used for the sole benefit of public charities in the manner hereinafter set forth.
. . . .

6. The Trustees shall distribute the income of the trust fund among such public charities created for religious, educational or other charitable purposes as they in their sole discretion may deem proper. The Grantors may from time to time suggest to the Trustees specific charitable institutions or charitable causes to which they would like contributions made by the Trustees but the Trustees are in no manner obligated to follow the requests of the Grantors but, on the contrary, may distribute the income and principal of the trust fund for such charitable purposes as they in their sole discretion may determine.

The Trustees shall from year to year determine what amounts of both income and principal of the trust fund shall be distributed to charitable institutions or for charitable purposes, and it is understood that there is to be no limitation placed on the discretion of the Trustees with respect to the amount of principal or income paid at any one time or to any one charity.

7. This charitable trust shall continue until the expiration of three years after the date when its assets have been entirely depleted. The Grantors may add additional assets to the trust at any time within three years after all of the assets of the trust have been exhausted; but if after a period of three years from the exhaustion of the trust fund no assets have been contributed to the trust fund by the Grantors, then at the end of such three

year period this Agreement shall be considered as having been cancelled by the parties hereto and the trust thereupon finally terminated.

Upon the death or resignation of W.R. Jackson, the Commonwealth Trust Company of Pittsburgh will select another in his place from the officers of the Pittsburgh-Des Moines Company; and if said Commonwealth Trust Company shall merge with another trust institution, the merged institution together with W.R. Jackson, or his successor, shall continue to act as Trustee.

Trust Agreement at ¶¶ 4, 6-7.

Trustee W.R. Jackson resigned in 1989. At that time, none of the officers of the Pittsburgh-Des Moines Company was willing to act as the individual trustee. The Orphans' Court appointed Appellant Polly J. Townsend, W.R.'s daughter, as the next individual trustee.[2] In connection with the resignation of Jackson and the appointment of Townsend, the trustees filed their First and Partial Account, which the Orphans' Court confirmed.

On May 25, 1994, Townsend resigned as the individual trustee. The trustees then filed a Second and Partial Account. No new individual trustee was appointed at that time.

On January 29, 1998, the Orphans' Court re-appointed Townsend as the individual trustee. The court also modified the succession provision of the Trust Agreement to state:

_____

[2] Although she was not at that time an officer of the Pittsburgh-Des Moines Company, Townsend was on the board of directors of the company, and had previously been an officer of the company.

- 3 -

> There shall always be two trustees acting hereunder, National City Bank of Pennsylvania and its successors and an individual trustee who is a member of the Jackson family. Upon the death, resignation or inability to serve of any individual co-trustee, the corporate trustee shall select as his or her successor a member of the Jackson family, subject to the approval of a court of competent jurisdiction.

Order, 1/29/98. National City Bank of Pennsylvania was a successor in interest to Commonwealth Trust Company.

On or about April 1, 2005, Townsend and National City Bank filed a Third and Partial Account in the Orphans' Court. They also filed a petition to reform the Trust to provide for two individual trustees and to appoint Townsend's brother, William R. Jackson, Jr., as the second individual trustee. On May 24, 2005, the Orphans' Court approved the Third and Partial Account and entered an order reforming the Trust's appointment provision to state:

> There shall always be three trustees acting hereunder, National City Bank of Pennsylvania and its successors, which shall possess at all times one-half of the voting power of the trustees, and two individual trustees who are members of the Jackson family, each of whom shall possess at all times one-fourth of the voting power of the trustees. Upon the death, resignation or inability to serve of any of then serving individual co-trustee, his or her successor shall be such member of the Jackson family designated as such by said co-trustee at or before the time he or she ceases to so serve. In the event that an individual co-trustee ceases to serve without designating his or her successor, the other then serving individual co-trustee shall designate a member of the Jackson family to fill such vacancy, or if no such designation has been made, the successor individual co-trustee shall be such member of the Jackson family designated to serve by the oldest living grandchild of William R. Jackson competent to make such designation. . . .

Order, 5/24/05. The court also approved the appointment of William R. Jackson, Jr. as the second individual trustee.

In 2006, Individual Trustees decided that they wanted to terminate the Trust. When National City Bank opposed the termination, Individual Trustees filed a petition in the Orphans' Court seeking to remove and replace National City Bank with a corporate trustee that would cooperate in terminating the Trust or, in the alternative, to terminate the Trust immediately. Individual Trustees explained:

> Petitioners' reasoning for terminating the Trust during their lifetimes centered on concerns that if the Trust continues past Petitioners' lifetimes or their ability to administer the Trust, that the succeeding generation of potential Trustees (Petitioners' children and grandchildren) (i) lack the knowledge of the Grantors and their philosophies, (ii) will disagree over the administration of the Trust and (iii) will cause the Trust assets to be distributed in a manner never contemplated by the Grantors.

Pet., 12/1/06, at ¶ 63. As authority for terminating the Trust, Individual Trustees relied on Paragraph 7 of the Trust Agreement, which states in part: "This charitable trust shall continue until the expiration of three years after the date when its assets have been entirely depleted."

Individual Trustees' request to terminate the Trust was unsuccessful. On May 24, 2007, the Honorable Robert A. Kelly granted National City Bank's motion for judgment on the pleadings, holding: (1) Paragraph 7 of the Trust Agreement is "not a basis for termination of the Trust"; and (2) the Individual Trustees' averments "do not constitute a basis for termination of the Trust but are merely allegations of a potential stalemate that may be

arising between the Individual Trustees and the Respondent, National City Bank." Order, 5/24/07. The order dismissed Individual Trustees' petition insofar as it sought termination of the Trust, but did not address their request to remove and replace National City Bank. *Id.* Individual Trustees did not appeal the May 24, 2007 order, and did not thereafter pursue replacement of National City Bank.

In late 2008, PNC acquired National City Bank and, as a result, became the corporate trustee. Since then, PNC and Individual Trustees have disagreed about the amount and recipients of the Trust's charitable donations, but until the present controversy, they were able to reach a compromise each year.

On September 9, 2016, Individual Trustees sent PNC a list of proposed charitable distributions totaling $701,000 for the year 2016. In response, PNC prepared an analysis of the proposed recipients and presented it to Individual Trustees on October 13, 2016. On November 1, 2016, Individual Trustees prepared a revised proposal, deleting some recipients from their original list and reducing the total distribution to $693,000.

On November 28, 2016, PNC filed a "Petition to Resolve a Deadlock Between Trustees Pursuant to Section 7763[(a.1)] of the Uniform Trust Act." PNC alleged that a deadlock had formed between itself and Individual Trustees regarding the amount and recipients of donations for the year 2016. PNC said that it sought judicial intervention because, in order to avoid a tax penalty under Section 4942 of the Internal Revenue Code ("Taxes on

failure to distribute income"), the Trust needed to distribute at least 5% of its net assets ($475,838) before the end of the year. PNC Pet., 11/28/16, at ¶¶ 18, 20.[3] PNC represented that, in order to meet the year-end deadline, it would need to begin processing distribution payments by December 12, 2016, a mere two weeks later. *Id.* at ¶ 32.

In its petition, PNC averred that, "[e]very year since Judge Kelly's Order, due to the desires of the individual trustees to make over distributions from the Charitable Trust and [PNC]'s desire to grow and preserve the Trust, the trustees find themselves facing a year-end deadline for complying with the requirements of Section 4942." PNC Pet., 11/28/16, at ¶ 20. Although PNC and Individual Trustees had compromised in previous

_____

[3] Section 4942 provides, in part:

> **(a) Initial tax.** There is hereby imposed on the undistributed income of a private foundation for any taxable year, which has not been distributed before the first day of the second (or any succeeding) taxable year following such taxable year (if such first day falls within the taxable period), a tax equal to 30 percent of the amount of such income remaining undistributed at the beginning of such second (or succeeding) taxable year. . . .
>
> **(b) Additional tax.** In any case in which an initial tax is imposed under subsection (a) on the undistributed income of a private foundation for any taxable year, if any portion of such income remains undistributed at the close of the taxable period, there is hereby imposed a tax equal to 100 percent of the amount remaining undistributed at such time.
> . . . .

26 U.S.C. § 4942(a), (b); *see also id.* § 4942(c)-(e) (calculation of "undistributed income" subject to tax). PNC alleged that the Trust is a "private foundation" for purposes of this provision. PNC Pet., 11/28/16, at ¶ 18.

years, PNC's petition averred that PNC was "no longer willing to jeopardize the long-term viability of the Charitable Trust for the sake of the short-term expediency of reaching an agreement with the individual trustees." *Id.* ¶ 27.

PNC stated that, "in keeping with the traditional giving pattern of the Charitable Trust during the lifetime of the Donors," it favored distributing the Trust's funds "to civic organizations, educational/arts organizations, health care facilities and children & youth organizations, with at least one-half of such distributions being to charitable organizations primarily situated in Western Pennsylvania." PNC Pet., 11/28/16, at ¶ 21. PNC characterized the organizations it favored as "worthwhile charities," and contrasted its list of preferred donees with those organizations favored by Individual Trustees, which it called "political advocacy groups." *Id.* at ¶ 27. In addition, PNC averred that the amount of distributions favored by Individual Trustees would eventually exhaust the Trust "in circumvention of Judge Kelly's [May 24, 2007] Order." *Id.* at ¶ 23.

PNC submitted to the court a list of proposed donees that, in its view, were "in keeping with (i) the giving history of the Charitable Trust[] during the lifetimes of John and Sue Jackson, and (ii) in keeping with Judge Kelly's Order of Court, dated May 24, 2007." PNC Pet., 11/28/16, at ¶ 28. PNC's list included 26 organizations selected by PNC to receive one-half of the required distribution ($237,919) and 18 organizations from the list Individual Trustees submitted to PNC, which were to receive the other one-

half of the required distribution. PNC asked the court "to resolve the current deadlock by casting a 'third vote,'" either in favor of the list it had compiled, or in favor of the list that Individual Trustees had proposed to PNC in their September 9, 2016 letter. *Id.* at ¶ 32.

On December 1, 2016, Individual Trustees filed an Answer and New Matter. Individual Trustees alleged that PNC "unilaterally imposed an artificial 5% limit on the Trust's annual charitable giving, forced the Trust to donate to local causes supported by PNC, and refused to allow charitable contributions to legitimate charities recommended by [Individual Trustees] (and supported by the Trust for decades)." Answer and New Matter at 1. They contended that the Grantors intended for the Trust's individual trustee(s) to make donation decisions and that PNC's "proper role — as set forth in the Trust Agreement and as demonstrated by the six decades-long history of the Trust before PNC's involvement — is to work with the [individual] Co-trustees to facilitate donations to charities selected by the [individual] Co-trustees and to manage the Trust's assets." *Id.* at 3, 6. Individual Trustees asked the court to deny PNC's petition, order PNC to make the contributions proposed by Individual Trustees on November 1, 2016, and order PNC —

> to assume its proper corporate co-trustee role, which includes providing the [individual] Co-trustees with information and recommendations for possible donations, vetting charities, investing the Trust's assets (along with the [individual] Co-trustees), and otherwise providing the traditional services that the corporate co-trustee for this Trust provided for almost sixty (60) years.

*Id.* at 44.  Also on December 1, 2016, Individual Trustees filed a Motion for Expedited Discovery.  They sought an evidentiary hearing at the conclusion of the discovery.

On December 2, 2016, the Orphans' Court held oral argument on PNC's petition.  Both parties, as well as a representative of the Attorney General of Pennsylvania, were present.[4]  PNC reiterated that it "need[ed] to cut checks by December 12th" in order to avoid the excise tax.  N.T., 12/2/16, at 26.  The Orphans' Court stated that it would cap donations at 5% of the Trust's assets because there was "no reason to go above" the amount required to avoid a tax penalty.  *Id.* at 24-25.  The court denied the motion for expedited discovery[5] and took the designation of charitable recipients under advisement.  *Id.* at 32.  On December 6, 2016, Individual Trustees filed a revised donation proposal, limiting their proposed donations to 5% of the Trust's assets.[6]  On December 7, 2016, the Orphans' Court

_____

[4] Under the UTA, "The Office of Attorney General has the rights of a charitable organization expressly named in the trust instrument to receive distributions from a trust having its situs in this Commonwealth and the right to notice of any proceeding or nonjudicial settlement agreement in which there is a charitable interest or purpose."  20 Pa. C.S. § 7710(d).  The Attorney General must be made a party in all proceedings involving charitable trusts.  *See In re Pruner's Estate*, 136 A.2d 107, 110 (Pa. 1957) (discussing predecessor to present statute).

[5] The court stated that it might revisit the issue of discovery if the parties could not agree on distributions for 2017.  N.T., 12/2/16, at 32.

[6] Individual Trustees recognized that the court had determined that it would not authorize distribution of more than 5% of the trust's assets in 2016, and
*(Footnote Continued Next Page)*

entered an order selecting the charities on PNC's list for distributions in 2016. The order stated that the court had considered PNC's petition, Individual Trustees' answer and new matter, Judge Kelly's May 24, 2007 order, and the December 2, 2016 oral argument. Order, 12/7/16. On December 14, 2016, Individual Trustees filed a motion for reconsideration or, in the alternative, for clarification of the court's December 7, 2016 order. On December 19, 2016, the Orphans' Court denied that motion.

On May 2, 2017, the Orphans' Court filed an opinion in which it explained its decision. The court stated:

> Given the time constraints which were placed upon the court by the unseasonable request, the court determined that a prudent decision would require distributions in order to not dissipate trust assets on non-trust intentions, solely because of the co-trustees['] inability to agree. The court chose 5% to be distributed for the current year utilizing the minimum investment return for private foundations. 26 U.S. Code §4942(e). The court also chose the charities as suggested by the corporate trustee, for the current year, solely because of the lack of time needed for all possible options to be fully vetted.
>
> While the court has made these determinations, nothing in the court's determinations for this calendar year, should be interpreted or extrapolated to any future years. Consequently, all parties in interest will have the opportunity, in the event that non-agreement by the trustees occurs, to seek court intervention as to what is in the best interest of the trust with regard to distributions and the charities receiving such.

Orphans' Ct. Op., 5/2/17, at 2.[7]

_(Footnote Continued)_ ————————————
they stated that by submitting this proposal, they were not waiving any rights. Donation Proposal, 12/6/16, at 1 n.1.

[7] There is no information in the record regarding whether the parties are facing another deadlock in 2017 and, if so, whether they have timely sought
_(Footnote Continued Next Page)_

- 11 -

On January 5, 2016, Individual Trustees filed a timely appeal in which they raise the following issues, as stated in their brief:

I. Did the Orphans' Court abuse its discretion by entering a series of Orders breaking a contrived "deadlock" between co-trustees of the John E. and Sue M. Jackson Charitable Trust (the "Trust" or "Jackson Family Charitable Trust") without hearing any evidence, without holding an evidentiary hearing, and/or without making any findings of fact?

II. Did the Orphans' Court abuse its discretion by failing to even attempt to ascertain the intent of the Grantors of the Trust, which, under settled Pennsylvania law, is the "pole star" of every trust?

III. Did the Orphans' Court abuse its discretion by allowing Appellee PNC Bank, N.A. ("PNC"), the fourth successor corporate co-trustee, to usurp donation authority away from Appellants Polly J. Townsend ("Polly") and William R. Jackson, Jr. ("Dick") (together, the "Jackson Family Co-trustees") even though the Grantors' intent was for the Jackson Family trustee(s) to exercise such authority and the Jackson Family trustee(s) did, in fact, exercise such authority free from interference from all predecessor corporate co-trustees for nearly sixty years before PNC's involvement with the Trust?

IV. Did the Orphans' Court abuse its discretion by resolving the contrived "deadlock" by PNC's artificial deadline of December 12, 2016?

V. Did the Orphans' Court abuse its discretion by limiting 2016 donations from the Trust to five percent (5%) of Trust assets even though any such limitation is directly contrary to the Trust instrument, which provides that there is "no limitation" on the amount of princip[al] or income that can be donated to charity,

*(Footnote Continued)* ───────────────

intervention by the Orphans' Court as suggested in the court's opinion. Our docket contains no indication that either party sought expedition of this appeal so that the parties' disputes could be resolved before the end of 2017, and it appears that proceedings in this appeal were delayed by the late filing of the record and at least one request to extend a briefing deadline. After the appeal was argued on September 19, 2017, we made efforts to accelerate our disposition.

and all donations proposed by the Jackson Family Co-trustees were consistent with the Grantors' intent and Trust history?

VI. Did the Orphans' Court abuse its discretion by refusing to permit donations in 2016 to so-called politically conservative charities even though such charities have received nearly 800 annual donations from the Trust for nearly $6 million?

VII. Did the Orphans' Court abuse its discretion in directing donations overwhelmingly to charities in Western Pennsylvania despite the Trust's donation history, which reveals that only approximately twenty-five percent (25%) of donations have been to Western Pennsylvania charities?

VIII. Did the Orphans' Court abuse its discretion and commit an error of law to the extent it relied in any way on the May 24, 2007 opinion of Orphans' Court Judge Kelly in resolving the contrived 2016 "deadlock?"

IX. Did the Orphans' Court violate the Jackson Family Co-trustees' due process rights by failing to afford them any hearing at which they could respond to the allegations in the Petition filed against them by PNC and/or present evidence in support of their Answer and New Matter?

X. Did the Orphans' Court abuse its discretion and commit an error of law by making donation decisions, thereby improperly exercising trustee discretion that is vested exclusively in the trustees?

XI. In the alternative, did the Orphans' Court abuse its discretion by selecting donations on PNC's proposed list of donations over the charities on the Jackson Family Co-trustees' proposed list of donations where the Jackson Family Co-Trustees' proposed donations were more consistent with the Grantors' intent and the Trust's 66-year donation history?

Individual Trustees' Br. at 6-7.[8]

_____

[8] The Attorney General's Office joined PNC's brief seeking affirmance and did not file its own brief. Three charitable organizations (The Leadership Institute, Young America's Foundation, and the National Right To Work Legal Defense and Education Foundation, Inc.), each of which was on Individual

*(Footnote Continued Next Page)*

We apply the following standard of review:

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

When the trial court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. It is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused. A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous.

We are not constrained to give the same level of deference to the orphans' court's resulting legal conclusions as we are to its credibility determinations. We will reverse any decree based on palpably wrong or clearly inapplicable rules of law. Moreover, we are not bound by the chancellor's findings of fact if there has been an abuse of discretion, a capricious disregard of evidence, or a lack of evidentiary support on the record. If the lack of evidentiary support is apparent, reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. Nevertheless, we will not lightly find reversible error and will reverse an orphans'

_(Footnote Continued)_ ─────────────
Trustees' list of proposed donees but not on that of PNC, filed _amicus curiae_ briefs in support of Individual Trustees.

court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.

*In re Paxson Tr. I*, 893 A.2d 99, 112-13 (Pa. Super.) (quotation marks and citations omitted; some formatting altered), *appeal denied*, 903 A.2d 538 (Pa. 2006). Because the Orphans' Court did not hold a factual hearing and did not make credibility determinations, we are not constrained by our standard of review in reviewing any factual determinations made by the court in this matter.

### Individual Trustees' Standing

PNC avers that Individual Trustees lack standing to bring this appeal because they do not have a substantial, direct, and immediate interest in the Trust. *See* PNC's Br. at 16-19. In a reply brief, Individual Trustees respond that PNC waived this argument by (1) naming Individual Trustees as respondents in its action, and (2) failing to object to Individual Trustees' standing in the Orphans' Court. *See* Individual Trustees' Reply Br. at 2. Individual Trustees also assert that co-trustees of a charitable trust have standing to appeal trust administration matters, and that they have standing on multiple other bases. *Id.* at 2-6. The Orphans' Court did not have any occasion to address whether Individual Trustees have standing to appeal.

The rules regarding appellate standing are well established. "Except where the right of appeal is enlarged by statute, **any party who is aggrieved** by an appealable order, **or a fiduciary whose estate or trust**

**is so aggrieved**, may appeal therefrom." Pa.R.A.P. 501 (emphasis added).

This Court has explained:

> An aggrieved party must have a substantial interest at stake. A substantial interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. In addition, the party's interest must be adversely affected in a manner[] which is both direct and immediate.

*In re McCune*, 705 A.2d 861, 864 (Pa. Super. 1997) (citations and quotation marks omitted), *appeal denied*, 724 A.2d 935 (Pa. 1998). In addition:

> Standing to APPEAL must be distinguished from the concept of standing to SUE. Rule 501 requires that an appellant, absent statutory standing to appeal, have party status in the lower court or in the administrative agency and be aggrieved by an appealable order. Any party in the proceedings below who was aggrieved by an appealable order has standing to APPEAL under Rule 501.
>
> The concept of standing to SUE, however, involves a party's capacity to initiate an action in the lower court or administrative agency, and often involves an analysis of the statute that the party is invoking.

20 West's Pa. Practice, *Appellate Practice* § 501:1 (2016-2017 ed.) (footnotes omitted).

We reject Individual Trustees' contention that PNC waived its objection to their standing. A challenge to a party's standing to sue is waived it if is not raised in the trial court, *see In re Estate of Schumacher*, 133 A.3d 45, 50 (Pa. Super.), *appeal denied*, 157 A.3d 477 (Pa. 2016); a challenge to a party's standing to **appeal**, however, need not (and indeed cannot) be raised in the trial court. The latter type of challenge may be raised in a

- 16 -

motion to quash or dismiss the appeal, or in an appellee's brief. **See** 20 Pa. West's Pa. Practice, Appellate Practice § 501:16. Because PNC was not required to contest Individual Trustees' standing to appeal in the Orphans' Court, it did not waive that issue. **See Id.** at § 501:1, § 501:16.

However, PNC's argument that Individual Trustees lack standing to bring this appeal is meritless. The appeal raises questions about Individual Trustees' powers and authority under the Trust Agreement. Among other things, Individual Trustees contend that the Orphans' Court's order interferes with their unilateral right to make decisions regarding the Trust's charitable gifts. PNC brought this action pursuant to Section 7763(a.1) of the UTA, 20 Pa.C.S. § 7763(a.1), which provides that "any of the trustees or any party in interest" may petition to have the court resolve a deadlock among trustees, and Individual Trustees contend that the Orphans' Court's order broke that deadlock in a way that unlawfully infringed upon their authority. Individual Trustees have standing to litigate these issues. Indeed, it would be strange to allow a trustee to bring a claim to break a deadlock with a co-trustee under Section 7763(a.1) and not then to allow the unsuccessful co-trustee to appeal a resulting decision adverse to that co-trustee's position. In terms of Appellate Rule 501, PNC's Section 7763(a.1) petition against Individual Trustees made Individual Trustees "parties" to this action, and the Orphans' Court's decision contrary to their position made them "aggrieved."

Individual Trustees also have standing under Rule 501 as "fiduciar[ies] whose estate or trust is so aggrieved" because the Orphans' Court's decision affects rights of unascertained beneficiaries under the Trust. Generally, "in the absence of some special trust purpose, neither 'the trustee's abstract interest in seeing the [grantor's] intent carried out, nor his concrete interest in fees' can confer the status of 'aggrieved party.'" *Appeal of Gannon*, 631 A.2d 176, 182 (Pa. Super. 1993) (footnote omitted) (quoting *In re Musser's Estate*, 17 A.2d 411, 414 (Pa. 1941)), *appeal denied*, 647 A.2d 902 (Pa. 1994). But a trustee may appeal from an order "construing the relative rights of beneficiaries if some are unascertained or incompetent to act for themselves." *Musser's Estate*, 17 A.2d at 414; *Gannon*, 631 A.2d at 182. In cases involving unascertained charitable beneficiaries, a trustee has standing to appeal notwithstanding the role of the Attorney General, because "[t]he Attorney General represents the public interest in a charitable trust rather than a particular class of potential beneficiaries and his representation does not affect [the trustee's] rights." *In re Thompson's Estate*, 206 A.2d 21, 27 (Pa. 1965). Because the charitable beneficiaries of the Trust were unascertained (and, indeed, one of the main issues in this action is who those beneficiaries should be), Individual Trustees had standing to appeal from the Orphans' Court's order determining the relative rights of the various beneficiaries. *See Musser's Estate*, 17 A.2d at 414; *Gannon*, 631 A.2d at 182.

PNC's argument that the decision in **McCune** forecloses the Individual Trustees' standing is misplaced. In **McCune**, this Court held that the distribution committee of a charitable trust lacked standing to appeal from an order regarding the trustees' first account. 705 A.2d at 864-65. **McCune** did not involve an appeal by a trustee of a charitable trust, and it is inapposite on these facts.

### Deadlock Among Trustees
### (Issues III, IV, X)

Several of Individual Trustees' appellate issues reflect their unwillingness to concede that there was a legitimate "deadlock" that called for the intersession of the Orphans' Court in this case. As noted, they also question the Orphans' Court's exercise of authority to break that deadlock.

At the heart of much of Individual Trustees' challenge is their contention that decisions regarding the Trust's charitable donations historically have been made by the Trust's individual trustees (who they refer to as the "Jackson Family Co-trustee(s)"), with the corporate trustee playing only a supportive role. They state:

> From 1950 through 2009 — which included the entirety of the Grantors' remaining lives — the Jackson Family Co-trustee(s) made all annual donation decisions for the Trust with the full support of the Grantors and corporate co-trustees. The role of the prior corporate co-trustees was to hold and invest the Trust's assets, prepare and maintain the Trust's books and records, prepare and file periodic statements, filings, and returns, and make the donations designated by the Jackson Family Co-trustee(s).
> . . . .

- 19 -

> For nearly six decades before PNC's involvement, the Jackson Family trustee(s) *always* chose which 501(c)(3)-qualified charities would get donations from the Trust and the amount of those donations, all without interference from the corporate co-trustee. The Grantors never complained about the Jackson Family trustee's donations or the fact that it was the family trustee — and not the corporate trustee — making those donation decisions. Every corporate co-trustee prior to PNC acknowledged the Jackson Family trustees' right and authority to fully direct the Trust's donations as well as its own limited role as holder and general manager (with the Jackson Family Co-trustee(s)) of the Trust's assets.

Individual Trustees' Br. at 13, 18 (emphasis in original, citations to the record omitted). Individual Trustees thus view exercise of "donation discretion" as a role belonging exclusively to them. *Id.* at 35. From this vantage point, Individual Trustees view PNC's insistence on an equal role in donation decisions as contrary to the Trust's administrative scheme. They view PNC's declaration of a "deadlock" as contrived, and consider the Orphans' Court's acceptance of PNC's assertion of a deadlock and subsequent decision to resolve that deadlock by entry of a judicial order to be an usurpation of Individual Trustees' historical powers regarding charitable donations under the Trust.

The Uniform Trust Act provides, "Cotrustees who do not reach a unanimous decision may act by majority decision." 20 Pa. C.S. § 7763(a). The statute does not allocate or divide co-trustees' decision-making authority among the trustees. As is the case regarding most other UTA provisions, a settlor may provide in the trust document for a regime different from this one. *See id.* § 7705. Indeed, a comment by the Uniform Law

Commissioners who drafted the corresponding section of the Uniform Trust Code ("UTC")[9] advises that crafting a more detailed provision governing co-trustee issues might be a more advisable course. They warn:

> Division of responsibility among cotrustees is often confused, the accountability of any individual trustee is uncertain, obtaining consent of all trustees can be burdensome, and unless an odd number of trustees is named deadlocks requiring court resolution can occur. Potential problems can be reduced by addressing division of responsibilities in the terms of the trust. Like other sections of this article, this section is freely subject to modification in the terms of the trust.

Uniform Law Cmt. to UTC § 703, published following 20 Pa. C.S. § 7763.

Here, however, Grantors made no provision in the Trust Agreement for a division of responsibilities between the individual and corporate trustees. Nor was such a division addressed when the trustee provisions of the Agreement were amended in 1998 and 2005. To the contrary, Paragraph 7 of the Agreement, as amended in 2005, states that the corporate trustee "shall possess **at all times** one-half of the voting power of the trustees, and two individual trustees who are members of the Jackson family . . . shall [each] possess **at all times** one-fourth of the voting power of the trustees." The Trust makes no special provision for a different allocation of power with respect to decisions about charitable donations, though it does alter Section 7763(a)'s "majority rules" requirement by stating that the corporate trustee has 50% of the voting power and Individual Trustees each have 25%. In

_____

[9] The UTA is Pennsylvania's modified enactment of the Uniform Trust Code. ***See In re Trust Under Agreement of Taylor***, 164 A.3d 1147, 1149 (Pa. 2017).

light of the clear terms of Paragraph 7, we disagree with Individual Trustees' contention that they possess exclusive power to decide who may receive charitable donations from the Trust. Although the Trust may have operated that way in past years (and, in particular, in the years prior to the 2005 amendment), this power now must be shared among all of the trustees, including PNC.

The power sharing arrangement dictated by Paragraph 7 of the Trust Agreement makes it imperative that the individual and corporate trustees work together on all issues relating to the Trust, including issues relating to charitable donations. Individual Trustees' view that they possess exclusive authority in this area is contrary to this mandate. Similarly, PNC's declaration when it filed this action that it was "no longer willing" to seek "the short-term expediency of reaching an agreement with the individual trustees," PNC Pet., 11/28/16, at ¶ 27, is inconsistent with its trustee responsibilities. We note that a trustee may be removed where "lack of cooperation among cotrustees substantially impairs the administration of the trust." 20 Pa. C.S. § 7766(b)(2).

Where trustees possessing equal power deadlock, the UTA permits any of them to petition for a judicial resolution of the deadlock. Section 7763(a.1) provides:

> When a dispute arises among trustees as to the exercise or nonexercise of any of their powers and there is no agreement by a majority of them, unless otherwise provided by the trust instrument, the court in its discretion, upon petition filed by any of the trustees or any party in interest, aided if necessary by the

report of a master, may direct the exercise or nonexercise of the power as it deems necessary for the best interest of the trust.

20 Pa. C.S. § 7763(a.1).[10] Here, there was a deadlock between Individual Trustees and PNC regarding charitable donations. As nothing in the Trust Agreement provides for a deadlock-breaking procedure that is inconsistent with that in Section 7763(a.1), PNC was entitled to seek judicial intervention under that section.

Individual Trustees contend that this deadlock was contrived. They suggest that it was possible to work out the disagreement with PNC, as had been done in past years, and that PNC declared a deadlock only because, as it admitted, it was "no longer willing" to try to reach an agreement. *See* PNC Pet., 11/28/16, at ¶ 27. But while it may be true that the deadlock was avoidable, the fact remains that there was "no agreement by a majority" of the trustees, which is all that was required to enable PNC to invoke Section 7763(a.1). We therefore do not agree that the parties' dispute did not fall within the terms of the statute. We add, however, that the Orphans' Court had discretion under Section 7763(a.1) to decline to order relief if it concluded that the deadlock was not legitimate or was more amenable to

_____

[10] The UTC provision on which Section 7763 of the UTA is based does not contain a subparagraph comparable to (a.1). Prior to enactment of the UTA in 2006, Pennsylvania trust statutes stated that an analogous statutory provision dealing with disputes among personal representatives, 20 Pa. C.S. § 3328, also applied to trusts. That cross-reference was removed as unnecessary upon Section 7763(a.1)'s enactment. *See* Jt. St. Govt. Comm. Cmt. – 2005 to 20 Pa. C.S. § 7780.6.

resolution without its intervention. In this respect, we note that Section 7763(a.1) is patterned after Section 3328(b) of the Fiduciaries Code, 20 Pa. C.S. § 3328(b), which uses similar language to bestow judicial discretion to address disagreements among personal representatives. **See** Jt. St. Govt. Comm. Cmt. – 2005 to 20 Pa. C.S. § 7763.[11] A comment to Section 3328(b) states, "By making application of the section discretionary with the court, it is believed that the court can compel fiduciaries to attempt first to reconcile their differences without using the section as a cloak for securing advisory opinions on all questionable matters." Jt. St. Govt. Comm. Cmt. – 1949 to 20 Pa. C.S. § 3328.

Similarly, the court had discretion to refuse to be bound by the deadline imposed by PNC as part of its petition under Section 7763(a.1). PNC told the court that it needed a resolution by December 12, 2016 to be able to mail donations by the end of the year, and that severe tax consequences would befall the Trust if the donations were not mailed before

---

[11] The Statutory Construction Act authorizes us to consult Joint State Government Commission reports in construing statutes, and, if necessary to resolve a lack of explicitness, to consider a statute's history and relevant former law. 1 Pa. C.S. §§ 1921(c), 1939. Section 3328(b) of the Fiduciary Code states:

> When a dispute shall arise among personal representatives as to the exercise or nonexercise of any of their powers and there shall be no agreement of a majority of them, unless otherwise provided by the governing instrument, the court, upon petition filed by any of the personal representatives or by any party in interest, aided if necessary by the report of a master, in its discretion, may direct the exercise or nonexercise of the power as the court shall deem for the best interest of the estate.

2017. Individual Trustees argue that these deadlines were contrived and that, even if the donations had to be made by December 31, 2016, there was no need for a resolution of PNC's petition two weeks before that. The Orphans' Court stated in its opinion that PNC's deadline presented it with an "unseasonable request," Orphans' Ct. Op. at 2, and it appears that the deadline severely hampered the court's ability properly to address the situation placed before it. We nevertheless conclude that the Orphans' Court did not abuse its discretion in trying to meet the deadline that PNC imposed. The court was faced with what it concluded were credible arguments in support of the deadline, and it determined that there was a significant risk that the Trust would be harmed if 2016 charitable gifts were not made by the end of the year. We defer to the Orphans' Court's assessment of that situation.

Ultimately, the Orphans' Court exercised its discretion to grant relief under Section 7763(a.1) by limiting the amount that could be donated by the Trust in 2016 and by selecting PNC's proposed list of charitable donees. Individual Trustees argue that the court abused its discretion in granting such relief because "the statute under which the purported 'deadlock' was decided does not give the court the powers of a trustee; rather, it expressly recognizes that the court (with the help of a master, if necessary) 'may *direct* the exercise or nonexercise of the power as it deems necessary for the best interest of the trust.'" Individual Trustees' Br. at 50 (quoting Section 7763(a.1) (emphasis in brief). They say the court "erred by delegating to

itself the power of a trustee" and "tak[ing] matters into its own hands," thereby usurping Individual Trustees' discretion to make the Trust's charitable donations. *Id.* at 50-51.

As explained below, we conclude that, as a result of the short deadline imposed by PNC's petition, the Orphans' Court erred in the manner in which it addressed the issues presented in this matter and, as a result, may have erred in its resolution. However, we do not agree with Individual Trustees' contention that, if the court had conducted a proper hearing and considered appropriate evidence, it could not then issue an order that resolved the dispute among the trustees. Section 7763(a.1) gives the court precisely that authority by stating that it may direct the exercise or nonexercise of such power as it deems appropriate; here, that meant it could direct the amount and designate the recipients of the Trust's 2016 charitable contributions.

In **Obici Trust**, 134 A.2d 900, 906-08 (Pa. 1957), the Supreme Court addressed an orphans' court's power to award similar relief as a result of a deadlock among trustees under pre-UTA statutes incorporating the similar power regarding disagreements among personal representatives. The trust's individual trustees disagreed about who to appoint as their successors, a question that the Supreme Court held had to be decided by them unanimously. The Supreme Court concluded that because the "disagreement makes this impossible, a court may be called upon to effectuate settlor's intention that the vacancy be filled." 134 A.2d at 907. The Court remanded

for the orphans' court to make "findings with respect to the proper successor" trustee and "thereafter direct the appointment of a successor trustee or trustees to fill the vacancies." *Id.* at 908.

Just as the Supreme Court held that the orphans' court in *Obici* could break the parties' deadlock by appointing a successor, so too could the Orphans' Court here break the deadlock by directing what charitable donations were to be made in 2016. There is nothing unlawful about a court's selection of a trust's charitable beneficiary. *See* 20 Pa. C.S. § 7735(b). Such an exercise of authority under Section 7763(a.1) is not an illegal usurpation of trustees' power, for it is specifically authorized by the UTA.

## Process To Resolve the Deadlock
## (Issues I, II, IX)

Section 7763(a.1) does not set forth any procedure or guidelines by which an orphans' court should determine *how* it is to resolve a deadlock among trustees. But the general principles that courts are to follow in resolving trust matters are familiar:

> "[T]he interpretation of a trust or a will presents a question of law. As such, our standard of review is *de novo*, and our scope of review is plenary." *In re Estate of McFadden*, 100 A.3d 645, 650 (Pa. Super. 2014) (*en banc*) (citations omitted).
>
> Certain principles guide trust interpretation. The [settlor]'s intent is the cornerstone of such an endeavor. As we articulated in *Estate of Pew*, 440 Pa.Super. 195, 655 A.2d 521, 533 (1994), it is "hornbook law that the pole star in every trust . . . is the settlor's . . . intent and that intent must prevail." *See also Estate of McFadden*, *supra*. We are not permitted to construe a provision in a trust so as "to destroy or effectually

nullify what has always been considered the inherent basic fundamental right of every owner of property to dispose of his own property as he desires, so long as it is not unlawful." *Estate of Pew, supra* at 533. Critically, the settlor's intent must be ascertained from the language of the trust, and we give effect, to the extent possible, to all words and clauses in the trust document. *See In re Estate of McFadden, supra; accord Farmers Trust Co. v. Bashore*, 498 Pa. 146, 445 A.2d 492, 494 (1982) ("A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument.").

*In re Estate of Loucks*, 148 A.3d 780, 781-82 (Pa. Super. 2016). "When the terms of a written trust instrument are clear and certain, parol or extrinsic evidence is not admissible to explain the settlor's intent. However, such evidence is admissible to prove intent where the written instrument is ambiguous." *Factor v. Getz*, 276 A.2d 511, 512 (Pa. 1971) (citations omitted).

The trustees' dispute before the Orphans' Court concerned what limits, if any, should be placed on the amount of charitable contributions made by the Trust in 2016 and what charities should be recipients of the Trust's gifts. As we explain in greater detail in the later sections of this opinion, resolution of those questions necessarily required determination of the Grantors' intent, and that determination required an evidentiary hearing. PNC contends that such a hearing was unnecessary because the Grantors' intent regarding these questions may be discerned from a review of the Trust Agreement itself, but we find PNC's contention disingenuous in light of PNC's own reliance on extrinsic evidence (such as historical donation records) to

support its position on such issues as whether donations should be made primarily to Western Pennsylvania organizations. *See* PNC's Br. at 28-29, 35-37. The Orphans' Court should have held a factual hearing to permit full exploration of the parties' dispute in light of the Grantors' intent. The court also should have granted Individual Trustees' request for expedited discovery to collect information relevant to the proceedings.

We are aware of only one reported appellate decision addressing an issue similar to this one, but it supports our view of a need for a factual record. In *Stuart v. Continental Illinois National Bank & Trust Co. of Chicago*, 369 N.E.2d 1262 (Ill. 1977), the Supreme Court of Illinois addressed a dispute between a corporate trustee and two individual trustees regarding the disposition of a charitable trust fund. The trust document gave the trustees discretion to choose charitable beneficiaries. 369 N.E.2d at 1266. When the trustees were unable to agree on a plan of distribution, the individual trustees filed suit to resolve the deadlock, and both the corporate trustee and the individual trustees submitted lists of proposed donees to the court. *Id.* at 1267, 1268-69. After a non-jury trial in which the court "heard conflicting testimony concerning the testator's intentions," the court adopted the plan submitted by the corporate trustee. *Id.* at 1266, 1269. The Illinois Supreme Court noted that when faced with a deadlock among the trustees, "it was incumbent upon the trial court to resolve the dispute by either appointing a new trustee or by framing a plan of distribution." *Id.* at 1275. "[T]he primary duty of the [trial] court was to

effectuate the probable charitable intent of the testator. The crucial issue is whether the evidence supports the conclusion that the court fulfilled this duty by ordering distribution pursuant to the plan which it did endorse." *Id.* Ultimately, the Illinois Supreme Court affirmed the trial court's selection of beneficiaries because it was supported by "competent and credible evidence," although the court rejected certain aspects of the plan endorsed by the trial court. *Id.* at 1276.

We recognize that the Orphans' Court was faced with time constraints here that limited the discovery it could allow and the time for any hearing. But by resolving PNC's petition on the basis only of the parties' submissions and oral argument, the court decided issues critical to the Trust without any factual evidence bearing on the Grantors' intent. The court therefore must hold a hearing at which it can give further consideration to these issues.

At the hearing, the parties may make a factual record that will enable the court to determine the Grantors' intent. It will be for the trial court to determine the relevance and probative value of whatever evidence is proffered, but we note that varying types of evidence may be considered. For example, courts often consider, in addition to the language of the instrument and the scheme of distribution, "the facts and circumstances existing at the creation of the trust." *In re Shoemaker*, 115 A.3d 347, 355 (Pa. Super. 2015). The Third Restatement of Trusts explains:

> Among the circumstances that may be of importance in determining the terms of a trust . . . in matters about which a written instrument is silent or ambiguous, are the following: (1)

the situations of the settlor, the beneficiaries, and the trustee, including such factors as age, legal and practical competence, personal and financial circumstances, and the relationships of these persons and these factors to each other; (2) the value and character of the trust property; (3) the purposes for which the trust is created; (4) relevant business and financial practices at the time; (5) the circumstances under which the trust is to be administered; (6) the formality or informality, the skill or lack of skill, and the care or lack of care with which any instrument containing the manifestation in question was drawn.

The intention of the settlor that determines the terms of the trust is the intention at the time of the creation of the trust and not a subsequent intention. The settlor's intention at the time of the trust's creation may be shown, however, not only by facts that occurred before or at that time but also by facts occurring thereafter to the extent evidence of those facts may be considered under the applicable rules of evidence to show the intention in question.

Restatement (Third) of Trusts § 4, Cmt. *a* (Am. Law Inst. 2003)[12]; ***see also***

***In re Estate of Krebs***, 483 A.2d 919, 921 n.1 (Pa. Super. 1984) (quoting

part of Restatement (Second) of Trusts § 4, Cmt. *a* (Am. Law Inst. 1959),

which is similar to the comment in the Third Restatement).

In addition, courts may consider direct evidence of the settlor's intent,

such as:

---

[12] Section 4 of the Third Restatement defines "terms of the trust." The UTC defines "terms of the trust" similarly to the Restatement. ***See*** UTC § 103(17) (Unif. Law Comm. 2000). Pennsylvania did not adopt the definition of "terms of the trust" from the UTC "because it implies that there may be terms outside the instrument governing the trust, which is undesirable and inconsistent with the approach of [Pennsylvania's UTA] to refuse enforcement of oral trusts." Jt. St. Govt. Comm. Cmt. – 2005 to 20 Pa.C.S. § 7703. Although Pennsylvania does not enforce oral trusts, we may consider Section 4 of the Restatement as it pertains to ambiguities in trust documents. ***See generally Estate of Krebs***, 483 A.2d at 921 n.1.

documents and testimony evidencing the donor's intention; the donor's own declarations of intention, written or oral; contents of the drafting agent's files; and written or oral statements made to the donor by the drafting agent or another concerning the contents or effect of the document, to the extent that the donor acquiesced, silently or expressly, in the other person's statement.

Restatement (Third) of Trusts § 4 Reporter's Notes (quoting Restatement (Third) of Prop.: Wills and Donative Transfers § 10.2 cmt. *f* (Am. Law Inst. 1999)); *see Estate of McKenna*, 489 A.2d 862, 867 (Pa. Super. 1985) (holding that testimony by the scrivener regarding his conversation with the testator was properly admitted to clarify an ambiguity in a will)[13]; *In re Estate of Rudy*, 478 A.2d 879, 881-82 (Pa. Super. 1984) (concluding that testimony of testator's lawyer, secretary, doctor, banker, and accountant was properly admitted, where the testimony "did not impermissibly intrude into the subjective intent of the testator, but rather referred only to the circumstances attendant to the execution of testator's will and codicil").

The Orphans' Court should make findings that support its conclusions about the Grantors' intent and should explain how those conclusions support its order resolving the trustees' deadlock.

**The Amount of Distributions
(Issue V, VIII)**

---

[13]  Cases involving wills are relevant because "the rules for determining a settlor's intent are the same for trusts as for wills." *In re Tr. of Hirt*, 832 A.2d 438, 448 (Pa. Super. 2003), *appeal denied*, 862 A.2d 1255 (Pa. 2004).

Individual Trustees argue that the Orphans' Court erred in limiting the Trust's 2016 distributions to 5% of the Trust's assets. PNC responds that the 5% figure was consistent with the Trust's historical giving patterns, Judge Kelly's May 24, 2007 order in the termination action, and a provision of the Uniform Principal and Income Act, 20 Pa.C.S. § 8113, that requires certain charitable trusts to donate between two and seven percent of their assets each year. The Orphans' Court chose the 5% figure based on the Internal Revenue Code provision that imposes a 30% tax on trusts that fail to distribute at least 5% of their assets in a given year. *See* Orphans' Ct. Op. at 2 (citing 26 U.S.C. § 4942). The court concluded there was no reason to exceed the 5% figure. N.T., 12/2/16, at 24. It said that in light of the time constraints imposed by the late date of PNC's petition, "the court determined that a prudent decision would require distributions in order to not dissipate trust assets on non-trust intentions." Orphans' Ct. Op. at 2.

Although the Orphans' Court did not expressly state that it found the Trust ambiguous with regard to the amount of annual distributions, the court appears to have implicitly made that finding. The parties also appear to have implicitly recognized this ambiguity in the Trust. As we previously suggested, we agree with this conclusion. The Trust Agreement states, "The Trustees shall from year to year determine what amounts of both income and principal of the trust fund shall be distributed to charitable institutions or for charitable purposes, and it is understood that there is to be no limitation placed on the discretion of the Trustees with respect to the amount of

principal or income paid at any one time or to any one charity." Trust § 6. The Trust document thus states that the amount of total annual contributions is a matter committed solely to the Trustees' discretion and that donation amounts are not subject to any specific limitation. The document provides no specific guidance to determine how the Trustees are to "determine what amounts of both income and principal of the trust fund shall be distributed to charitable institutions." The court therefore could consider extrinsic evidence in deciding this question.

The considerations cited by PNC to support the trial court's decision to limit donations to 5% of assets are not persuasive. The Orphans' Court was entitled to consider the historical giving patterns of the Trust in determining the amount of distributions for the year 2016, but we see no indication in the record that the court took judicial notice of those patterns. PNC's reliance on Judge Kelly's May 24, 2007 order and on 20 Pa.C.S. § 8113 to support the decision are misplaced. We fail to see the relevance of the 2007 order to the current dispute, which does not involve an attempt to terminate the Trust.[14] The Orphans' Court's opinion made no mention of Section 8113 (which was enacted more than 50 years after the Trust was established), and PNC concedes that Section 8113 does not apply to trusts, such as the

_____

[14] While the Orphans' Court stated in its December 7, 2016 order that it had considered Judge Kelly's 2007 order, the court's Appellate Rule 1925(a) opinion makes no mention of the 2007 order.

one at issue in this case, which are already subject to 26 U.S.C. § 4942. *See* PNC's Br. at 31 n.4.

We conclude, however, that the Orphans' Court did not abuse its discretion in limiting the 2016 distribution amount to that necessary to avoid imposition of a tax penalty on the Trust. In this way, the court elected to dissipate the least amount of Trust assets, preserving them until a more considered decision could be made without the time pressures imposed by PNC's petition. In view of the short timeline, the court acted prudently.

Going forward, it will be necessary for the court to engage in a closer assessment of the Grantors' intent on this issue. We note, for example, that PNC approaches this question from the viewpoint that contributions should be minimized so that the Trust's assets may be preserved and the Trust may have as long a life as possible. The Trust Agreement, however, calls this premise into question, as it contemplates that contributions will eventually deplete the Trust. *See* Trust Agreement ¶ 7 ("This charitable trust shall continue until the expiration of three years after the date when its assets have been entirely depleted"). Although Judge Kelly's May 24, 2007 order stated that this provision did not support the request for termination of the Trust that was before him, he did not state that the Trust's annual charitable donations must always be limited to preserve the Trust corpus and prevent the Trust's expiration. A factual record will be needed to explore the Grantors' intent regarding this question.

**Selection of Donees**

**(Issues VI, VII, VIII, XI)**

Individual Trustees also contend that the Orphans' Court erred by selecting PNC's list of proposed donees without attempting to discern the Grantors' intent. In the alternative, Individual Trustees argue that the Orphans' Court erred by not choosing their proposed donees, who had all previously received donations from the Trust. Individual Trustees' Br. at 51-54.

More broadly, Individual Trustees accuse PNC of attempting to take over the Trust so that it can impose its own donee selection criteria in place of those preferred by the Grantors. Individual Trustees' Br. at 18-21. They emphasize that throughout the Trust's history (including during the Grantors' lifetimes), donee selection was handled by the Trust's individual trustees, and that the corporate trustee played only a supporting role. They argue that this was the process favored by the Grantors, as it kept the Trust's charitable program within the control of family members of the Grantors who would assure compliance with the Grantors' preferences for giving. Therefore, they suggest, even if Individual Trustees no longer have exclusive control over this process, their preferences should accorded deference by PNC and by the Orphans' Court in this action.

PNC responds that the Orphans' Court correctly chose its list, which, it says, was consistent with the Grantors' intent, as demonstrated by "the traditional gift giving patterns of the Charitable Trust during the lifetimes of the Grantors." PNC's Br. at 37-38. PNC also suggests that its proposed

donees had a greater need for funds than Individual Trustees' proposed donees. *Id.* at 38-39.

The Orphans' Court explained that it chose PNC's list "solely because of the lack of time needed for all possible options to be fully vetted." Orphans' Ct. Op. at 2. In effect, then, the court simply picked one list rather than the other because it had insufficient time to give considered judgment to the question of which charities should be selected. While we agree that the timing of PNC's petition left the Orphans' Court with little time to resolve it, we conclude that the court abused its discretion by making a decision that was not based on any evidence. *See In re Paxson Tr. I*, 893 A.2d at 112-13. We also conclude that the court abused its discretion by accepting PNC's invitation to choose either its list or that proffered by Individual Trustees; the court was required to exercise judgment to determine appropriate recipients of the Trust's gifts, and it should not have allowed its selection to be constrained by the parties' submission of exclusive slates.

The Grantors' intent with regard to beneficiaries cannot be ascertained based on the Trust Agreement alone. That document merely states, "The Trustees shall distribute the income of the trust fund among such public charities created for religious, educational or other charitable purposes as they in their sole discretion may deem proper." Trust § 6. It does not mention any specific charity, geographic location, or ideology. Because the Trust is silent with respect to these more specific issues, the Orphans' Court was required to consider extrinsic evidence of the Grantors' intent to

determine whether additional criteria should be applied to the donee selection process. *See In re Beisgen's Estate*, 128 A.2d 52, 55 (Pa. 1956); *accord Stuart*, 369 N.E.2d at 1266. The court abused its discretion in failing to do so.

In considering extrinsic evidence, we believe the history of the Trust's giving is relevant. *See* PNC's Br. at 37 ("the 44-year gift-giving history of the Charitable Trust during the period that the Grantors had input into the distributions of the Trust . . . represents the best evidence of the Grantors' actual intentions"). In this connection, the giving pattern of the first individual trustee, W.R. Jackson, is important. Although PNC is correct that W.R. Jackson's preferences "are not controlling," *id.*, they do reflect the Trust's charitable giving pattern during the Grantors' lives. In addition, it would be logical to assume that by picking W.R. Jackson, the Grantors' brother and brother-in-law, the Grantors selected someone whose giving philosophy was known to them and with which they agreed. A factual record might prove otherwise, but in the absence of such contrary evidence, it would seem that the charitable preferences of W.R. Jackson are entitled to weight in determining the Grantors' intent. We note that the Trust Agreement states that the charitable decisions of the trustees would control even if the Grantors expressed a preference to donate to a different charity,

which shows that the Grantors placed significant confidence in W.R. Jackson's judgment.[15]

The extrinsic evidence also should shed light on whether, as Individual Trustees contend, greater deference should be paid to the charitable preferences of Individual Trustees than to that of the corporate trustee. We have held that Individual Trustees and PNC share equal power in making charitable decisions, but that does not mean that the Grantors' intent was not to accord greater deference to Individual Trustees' charitable preferences. As noted, the original individual trustee was W.R. Jackson, in whom the Grantors apparently placed confidence. Individual Trustees claim that the original corporate trustee, Commonwealth Trust Company, played no role in selecting charities. If true, that may mean that the Grantors intended to defer to Individual Trustees on this issue.

This question is complicated by the parties' surprising disagreement about the Trust's history. PNC says that Individual Trustees were not intended to be Jackson family members, but merely Pittsburgh-Des Moines Company executives, and it objects to Individual Trustees' emphasis on their link to the Jackson family as a reason to pay deference to their preferences. Individual Trustees claim that the Trust Agreement's original provisions for

---

[15] **See** Trust Agreement ¶ 6 ("The Grantors may from time to time suggest to the Trustees specific charitable institutions or charitable causes to which they would like contributions made by the Trustees but the Trustees are in no manner obligated to follow the requests of the Grantors but, on the contrary, may distribute the income and principal of the trust fund for such charitable purposes as they in their sole discretion may determine").

selection of trustees referenced Pittsburgh-Des Moines officers only because the Jackson family had a controlling interest in that company and a selection from its officers would necessarily be a selection of a Jackson family member. Their emphasis on family ties is supported by the fact that the 1998 and 2005 amendments to the trustee provision (which were made after Pittsburgh-Des Moines went out of business) specifically required individual trustees to be Jackson family members. A factual record is needed to resolve these questions.

As was the case with respect to the amount of annual giving, we consider PNC's reliance on Judge Kelly's May 24, 2007 order in relation to this issue misplaced. Nothing in that order discusses selection of appropriate charitable recipients. PNC must present evidence of how that order helps to prove the Grantors' intent in order for the order to be relevant.

With respect to specific criteria for selection of donees, the parties agree that all recipients of the Trust's gifts must be legitimate charities. *See* 20 Pa. C.S. § 7735(a); Trust Agreement ¶ 4.[16] We find no support in the

---

[16] We do not understand PNC to argue that any of the organizations currently on the list of gift recipients proposed by Individual Trustees fails to qualify as a charity under Internal Revenue Service rules for determining charitable status. It appears that some organizations on a prior list submitted by Individual Trustees did not qualify, but Individual Trustees explain that they relied on PNC to inform them of any qualification issues and that they removed any non-qualifying recipients from their list upon receiving such information. Individual Trustees' Br. at 13; Answer and New Matter at 30-33.

Trust Agreement for PNC's preference for charities that provide "a direct service to the poor, the underprivileged or the needy," PNC's Br. at 38, as opposed to Individual Trustees' preference for organizations that "promoted the U.S. Constitution, free market principles, personal freedom and personal rights," Individual Trustees' Br. at 17. The Trust Agreement references only "public charities created for religious, educational or other charitable purposes." Trust Agreement ¶ 6. Any further restrictions regarding types of charitable service must be discerned from the factual record regarding the Grantors' intent. We reject PNC's suggestion, PNC's Br. at 38 n.6, that the Trust's charitable recipients should be limited to those qualifying under the Institutions of Purely Public Charity Act, 10 P.S. §§ 375, a 1997 enactment relating to exemptions from state and local taxation. That statute can have no bearing on the intent of the Grantors when they established their trust in 1950.

We also find no support in the Trust Agreement for PNC's disapproval of organizations that advocate in favor of selected public causes (what PNC calls "political advocacy groups," *see* PNC's Br. at 38-39), so long as the organizations' advocacy does not disqualify them from charitable status.[17]

---

[17] This litigation arose as a result of the requirement under federal tax law that the Trust make annual charitable distributions of 5% of its assets. Qualification of the Trust's beneficiaries as charities under the Internal Revenue Code therefore is essential. That Code states that "no substantial part" of the activities of a charity may consist of "carrying on propaganda, or otherwise attempting, to influence legislation" or "participat[ing] in . . . any political campaign on behalf of (or in opposition to) any candidate for public
*(Footnote Continued Next Page)*

The parties dispute whether such organizations were intended by the Grantors to be recipients of Trust funds, and the historical giving record on that issue therefore may be revealing.

Similarly, we see nothing in the Trust Agreement that supports PNC's preference that donations be made to charities in Western Pennsylvania. PNC says that this preference mirrors the Trust's giving record during the Grantors' lifetimes. Individual Trustees point out that the Grantors moved out of Western Pennsylvania in 1958 and claim the Grantors did not make substantial gifts to Western Pennsylvania charities after that. Resolution of this question, like the others, requires consideration of the Grantors' intent as reflected in the Trust's scheme of distribution and history of giving.

Finally, we agree with PNC that Paragraph 6 of the Trust Agreement requires the trustees to exercise their discretion in selecting gift recipients anew each year, and does not bind the trustees to contribute to the same organizations year after year. *See* PNC's Br. at 40-41. The Trust's historical giving record is relevant insofar as it sheds light on the Grantors' intent

*(Footnote Continued)* ─────────────

office." 26 U.S.C. § 501(c)(3). This prohibition bars charities from lobbying or participating in political campaigns, but "permits them to receive tax-deductible donations and to engage in limited, issue-based political advocacy." *United States v. NorCal Tea Party Patriots (In re United States)*, 817 F.3d 953, 954 (6th Cir. 2016). *See generally* 26 C.F.R. § 1.501(c)(3)-1; IRS Rev. Rul. 2007-41, 2007-25 I.R.B. 1421, 2007-1 C.B. 1421 ("Section 501(c)(3) organizations may take positions on public policy issues, including issues that divide candidates in an election for public office," but "must avoid any issue advocacy that functions as political campaign intervention"). Individual Trustees contend that all of their proposed beneficiaries meet these requirements, and we do not understand PNC to dispute that contention.

regarding charitable contributions, and the trustees must be guided by that intent. But ultimately, selection of gift recipients must be done jointly by the Trust's three trustees in a good faith exercise of their discretion under the Trust. We emphasize once again that the Trust Agreement requires the Trust's three trustees to work together to perform that task. Requests that the Orphans' Court break deadlocks on these issues should be extraordinary. When, as here, such a request is made, the Orphans' Court must exercise its independent judgment, guided by the same criteria as those that bind the trustees.

## Disposition

We affirm that part of the Orphans' Court's order that required distribution of 5% of the Trust's assets in 2016 and vacate the part of the order that adopted PNC's list of donees. We remand for further proceedings to determine the Grantors' intent with regard to distribution of the Trust's funds. The court shall permit expedited discovery.

We also leave it to the Orphans' Court in the first instance to determine as a matter of equity what, if anything, should be done regarding the 2016 distributions that were made by the Trust pursuant to that court's December 7, 2016 order, which selected charitable recipients from PNC's preferred list. Recipients of those distributions are likely to have relied on those funds, and it may be unrealistic and inequitable to consider any repayment obligation if the Orphans' Court ultimately decides that gifts should have been awarded to different recipients. It also may no longer be

practical to make additional 2016 contributions to additional charities from Individual Trustees' preferred list. The Orphans' Court should work with the parties to craft any additional remedy.

Order affirmed in part and vacated in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2017